(4 Misc. Rep. 207.)

THOMSON–HOUSTON ELECTRIC CO. v. DURANT LAND IMP. CO.

(Common Pleas of New York City and County, General Term.  June 5, 1893.)

1. LANDLORD AND TENANT—POSSESSION UNDER LEASE.
   Where a lessee actually occupies a portion of the demised premises after the execution and delivery of the lease, it cannot claim to be in possession under a prior contract for the lease, though it is prevented from taking entire possession by reason of uncompleted alterations and repairs.

which such lease provided should be completed prior to the commencement of the term.

2. SAME—PARTIAL POSSESSION BY PERSON HAVING INFERIOR TITLE.

Nor does the fact that a portion of the demised premises are at the beginning of the term, and thereafter continue to be, in possession of a person having a title inferior to the lessee's, justify a claim by the latter that it was not given full possession.

3. SAME—CONDEMNATION OF LEASED BUILDING—LIABILITY FOR RENT.

Where demised premises consist of a large brick building, which is condemned as unsafe, and ordered to be torn down, in proper legal proceedings, the lessee is not relieved from the payment of rent, where it takes and retains the beneficial use of the premises after such condemnation, though the lease provides that the premises shall be delivered to the lessee in a "sound and substantial condition, and in a good state of repair," and that any alteration required during the term, by any law or authority whatsoever, shall be made at the expense of the lessor.

4. SAME—FAILURE OF LANDLORD TO REPAIR—DAMAGES.

Where it appears that a tenant to whom the lessee had sublet a portion of such premises left the same, and rescinded his contract, because of failure of the landlord to make certain alterations in the stairways after due notice, as provided in the lease, the lessee is entitled to damages sustained by reason of the loss of such tenant.

5. SAME—SUFFICIENCY OF EVIDENCE AS TO DAMAGES.

Evidence that other persons might have hired certain portions of such premises which the lessee desired to sublet, if such repairs had been timely made, is insufficient to predicate thereon a specific finding of damages for failure to repair.

6. SAME—REFUSAL OF LESSEE TO SUBLET—UNSAFE CONDITION.

Such lessee is not entitled to damages for loss of a subtenant to whom it refused to sublet because the building had been condemned as unsafe in proper legal proceedings.

7. SAME—FAILURE TO REPAIR—MEASURE OF DAMAGES.

Nor is such lessee entitled to damages, to the extent of the rental value for one year of such portions of such building as were not ready for occupancy at the commencement of the term, because of uncompleted repairs which the lease required the lessor to make prior thereto, where it is not shown that the lessee could have rented such portions, had the repairs been completed as required.

8. SAME.

In such case the lessee is entitled, as damages, to the rental value of such portion of the building until such repairs were substantially completed.

9. SAME—DUTY OF TENANT TO REPAIR.

Where the lessee fails to make, at the lessor's expense, comparatively slight alterations, which the latter has neglected to make, as required by the lease, and also fails to show any attempts, for several years, to sublet the premises as they are, or how much less, if any, the rental value was, because of the absence of such repairs, such lessee is not entitled, as damages, to the rental value of such premises during such years.

10. SAME—FAILURE OF LANDLORD TO REPAIR FIXTURES.

Where such lease includes boilers and engine in such building, the kind and condition of which were obvious, and known to the lessee, the latter is not entitled to recover as damages, from the lessor, the cost of new boilers and engine, on failure of the latter to put the old ones in "a sound and substantial condition, and in a good state of repair," as provided by the lease, and which could have been put substantially in such condition, though they were not of a character suitable for the lessee's business.

11. SAME.

In such case the measure of the lessee's damages is the sum necessarily expended by it in repairing such machinery.

**12. SAME—FAILURE OF TENANT TO INSURE PREMISES.**

Such lease provided that if there should be imposed, for insuring the demised premises, a rate greater than a rate specified, and the increased rate should be imposed by reason of the letting, or of any subletting, the lessee should be charged with such excess, and that in case the rate charged should exceed the rate specified the lessee might procure the insurance in satisfactory companies. *Held* that, where the lessee failed to effect the insurance, a claim by it that the rate paid by the lessor was excessive must be established by the clearest evidence.

**13. SAME—INCREASE OF RATE BY CONDEMNATION OF BUILDING.**

Though the lessee is entitled to an allowance for increased rate by reason of the condemnation of such building as unsafe, the mere general statements of insurance agents that the rates were increased thereby afford no basis for computing any just allowance therefor.

Appeal from judgment on report of referee.

Action by the East River Electric Company of New York against the Durant Land Improvement Company to enjoin defendant from commencing or prosecuting summary proceedings for the eviction of plaintiff from certain premises leased to its assignor by defendant's assignors, and for damages for failure to perform the covenants of such lease. After the commencement of the action the name of the plaintiff was changed, by order of the supreme court, to the Thomson-Houston Electric Company of New York. From a judgment entered on the report of a referee, in favor of defendant, for $75,279.57, unpaid rent, and dissolving a temporary injunction, plaintiff appeals. Affirmed.

The opinion of the referee is as follows:

The plaintiff, a lessee, having successfully defended in the district courts numerous summary proceedings for eviction for nonpayment of rent, brought this action against the defendant corporation, the Durant Land Improvement Company, the assignee of the lessors, for equitable relief, subsequent to the suggestion contained in the opinion of the general term of this court in the action, Durant Land Imp. Co. v. East River Electric Light Co., (delivered in June, 1889,) 6 N. Y. Supp. 659. The premises described in the lease and complaint, Nos. 421 to 431 East Twenty-Fourth street and 428 to 434 East Twenty-Fifth street, New York city, consist of the old Durant sugar house, now seven stories in height. The structure, formerly known as the "Durant Sugar House," the construction of which is hereinafter fully described, was lower than the present building, the sixth and seventh (gallery) stories having been added some time prior to the execution of the lease. In November, 1887, the plaintiff entered into an agreement for a lease, and subsequently, on the 4th day of January, 1888, the lease in question was executed, to take effect May 1, 1888. At the time the lease was executed, in January, 1888, there was in the building a vacuum pan extending from the ground floor throughout the building, occupying a space of varying area in each floor, which, when taken out, in the spring of 1888, left an open space in the flooring of each story about sixty feet square. The plaintiff, before its lease went into effect, and prior to May, 1888, commenced preparing foundations for a large steam engine to be used in connection with its electric light plant at this station; and during this period the defendant was having the vacuum pan, extending throughout the building, removed, and the floors restored. This work, and other work covenanted by the defendant to be done, were not completed on May 1st.

The issues raised by the pleadings are these: The complaint alleges, in substance, the agreement for a lease, of November 15, 1887, between Frederick C. Durant and others, the assignors of the defendant, and one Moore, whereby the Durants agreed to make and deliver to Moore, or his assigns, an indenture of lease, to commence May 1. 1888, of the premises described in the complaint, and leases of portions thereof, as the same shall be ready and fit for occu-

pancy, at the request of said Moore. That the annual rental reserved to be paid by the lease was $14,500. The assignment, for a good and valuable consideration, to plaintiff, the East River Electric Light Company, of said agreement. That prior to May 1st the plaintiff, the East River Electric Light Company, with the permission of the makers of said agreement, entered into possession of parts of the first and second floors of said building. That on or about the 4th of January, 1888, the said Durants leased and rented to the plaintiff the premises described in the complaint, above referred to, for the term of thirty-three years from the 1st day of May, 1888, with the privilege of two renewals. That the said Durants conveyed the premises to the defendant corporation, subject to the aforesaid lease. That it was known to the lessors that the upper floors were required for manufacturing purposes. That before and after May 1st, the lessors entered upon the said premises with a large force of workmen, and proceeded to dismantle the same by tearing down columns of wood from top to bottom, and from wall to wall. That the defendant or its assigns has been in control of the third, fourth, fifth, sixth, and sixth and a half floors, and parts of the first and second floors, of the premises, and that by means of having taken away the stairs or staircases, and having floored over the hatchways, and removed beams and girders, and torn up the floors, it cut off access to the premises, and thereby failed to deliver possession thereof to the plaintiff, as stipulated in the lease. The said building was condemned in proceedings instituted by the fire department of the city of New York, and declared to be unsound, and in a dangerous condition. That by the terms of the lease the rent of the premises, or of that portion of the beneficial use of which the plaintiff was deprived, was suspended and abated until plaintiff was put in full possession. That thiry days' notice to put in certain staircases on the Twenty-Fifth street portion of the premises was duly served upon the owners. That defendant prevented plaintiff from obtaining possession. That under a covenant in the lease it was agreed that all "alterations, improvements, rebuildings, additions of and to the said property, which should be required at any time during the said term by any present or future law, ordinance, or authority whatever, should be made by the lessors at their own expense, provided such alterations, improvements, rebuildings, and additions should be such as are of a permanent nature, and become a part of the freehold." That in the proceedings instituted by the fire department to have the building declared unsafe it was adjudged by the verdict of a jury that the premises were dangerous and unsafe, and that an order or precept of the court required the owner to put the said building in a safe and sound condition. That thereby the plaintiff has been prevented from obtaining possession of a greater part of the said premises, and will be unable, at any time, to carry out the terms of the agreement, for the reason that the work directed to be done under the findings of the jury will materially decrease the amount of space in the building, and will decrease the amount of air and light. That the said Frederick O. Durant, Charles W. Durant, and Howard M. Durant "did, prior to the making and executing of said lease, falsely represent to the plaintiff that the boilers, machinery, and appurtenances in said building were in good condition, and suitable for the purposes for which they would be required by the plaintiff, which was known to the lessors, but that in fact the said boilers and machinery were in bad condition, entirely useless and unsuitable for the purposes for which they were required, whereby plaintiff has suffered damage in the sum of fifty thousand dollars." The complaint then alleges that various summary proceedings for eviction for nonpayment of rent were brought in the district courts, and that finally, in one of them, above referred to, the court suggested that, as no affirmative or equitable defense or counterclaim could be set up in summary proceedings, the disputes between the parties as to the amounts due upon the lease, if any, should be established in a court of competent equitable jurisdiction, under which, it is alleged, this action is brought. That plaintiff has built up, and is carrying on, an extensive business in the furnishing of electricity for heat, light, and power to customers, having spent large sums of money in and upon the premises and upon the machinery for that purpose. That the plaintiff, by reason of the facts alleged, has been unable to give possession

to persons with whom agreements to take portions of the premises leased had been entered into, for the supply of steam and electric power, and that it has thereby suffered special damage in sum of $110,000. That by reason of the failure of the defendant to put the building in good and substantial repair, and in sound condition, the risk assumed by insurance companies is about doubled, and that plaintiff was required to pay $2,500 each and every year for the excess of premium alleged to have been thus made necessary, over and above the proper insurance premium. That the defendant is irresponsible, pecuniarily, and that by reason of the premises no measure of damages allowed by law would compensate the plaintiff if defendant were allowed to proceed with such summary proceedings; and for this reason, and to prevent multiplicity of suits, plaintiff demands judgment that it be adjudged and decreed that defendant has never delivered to the plaintiff the premises described in the complaint in good and substantial repair, and in sound condition, and that they are therefore not entitled to any rent, and should be restrained from bringing any action at law to collect the same, or any summary proceedings, and that the defendant, its officers and agents, should be restrained from bringing such action, or instituting such summary proceedings, in any court, for the nonpayment of rent, or from otherwise interfering with the equitable and peaceable enjoyment of that portion of the premises occupied by the plaintiff, with temporary injunction, and for the damages above referred to. The answer of the defendant puts in issue nearly all the allegations of the complaint, except that it admits the making of the lease, and its covenants, and that prior to the 1st of May, 1888, the building was condemned by the fire department, and declared to be unsafe and unsound; but it denies the materiality of said allegation, and alleges that the said fact contained in the said complaint is immaterial. The answer further sets up as a separate defense, and by way of counterclaim, the lease referred to, and assignment to the Durant Land Improvement Company, and that the said lease was accepted by the plaintiff, and became binding upon the parties to this action. That the annual rental of $14,500, in four equal quarterly installments, in advance, on the 1st day of May, August, November, and February, became due and payable, and that on the 1st of May, 1888, the defendant, then the owner of the premises, duly tendered the plaintiff the possession of the premises, and duly surrendered the same to the plaintiff. That plaintiff accepted the premises, and ever since the 1st of May, 1888, has been, and still is, in possession and occupation of the same, and that it has fitted up in the premises an electric lighting station, and has continuously used the premises in the prosecution of said business, and that there is due the defendant the entire rental reserved in said lease from May 1, 1888, to the present time, which the plaintiff neglects and refuses to pay. That in addition to said rent there became due, as additional rent, taxes, assessments, and charges imposed upon said premises, which plaintiff has neglected to pay. That there also became due, as additional rent, the amount paid as premiums for fire insurance, over and above a premium at the rate of one-half of one per cent., which the lessor agreed to assume. The answer then demands judgment for the rental reserved in the said lease, and the additional sums paid for taxes and insurance premiums, which plaintiff had neglected to pay.

The important provisions of the lease executed January 4, 1888, taking effect May 1, 1888, which govern the questions in controversy, to be regarded in deciding the issues raised, are: (1) That the lessee and assigns agreed to hire the premises described in the complaint, "including all shafting, pulleys, or hangers, formerly a portion of them above and now on the premises above described, but not put up. Large engine on first floor, with all countershafts, pulleys, hangers, and belting belonging thereto. Boilers, smokestack, two feed water tanks, two feed water pumps. All piping and connections, as now existing in the boiler and other houses, and under adjacent streets, to the East river. Also, platform scales. All as per inventory to be annexed hereto,"—for the term of 33 years, at $14,500 per annum, payable quarterly on the 1st day of May, August, November, and February of each year. (2) That "the parties of the first part will deliver and surrender to

the party of the second part, its successors or assigns, the property hereby demised, on the first day of the term herein provided for, in a sound and substantial condition, and in a state of good repair." (3) That "the said parties of the first part, their heirs, executors, administrators, or assigns, at any time after the date of this lease, and upon 30 days' notice in writing to that effect, given to them by the party of the second part, its successors or assigns, shall and will, as soon as practicable after the giving of such notice, complete the seventh floor of the building hereby leased, in the same manner as the portion of the said seventh floor now laid." (4) That "the said parties of the first part, their heirs, executors, administrators, or assigns, at any time after the date of this lease, and upon 30 days' notice in writing to that effect given to them by the party of the second part, its successors or assigns, shall and will, as soon as practicable after the giving of such notice, put in and build two staircases in the Twenty-Fifth street portion of the building hereby demised, and one staircase in the Twenty-Fourth street portion of the same building, and also shall alter the location of the hatchways and of the Otis elevator now in said building, and alter in size the large freight elevator." (5) That "it being, however, mutually understood and agreed by and between the parties hereto, that if there shall be imposed for insuring the said property, as hereinabove agreed, a premium at a rate greater than the rate of one-half of one per cent., and if the said greater premium is imposed by reason of this letting, or of any subletting, by the party of the second part, its successors or assigns, of the said property demised, or by reason of any additions, alterations, rebuildings, or improvements made by the said party of the second part, its successors or assigns, to the said property, then and in that event any portion of the premium necessary to be paid for insuring said property in the manner hereinabove specified, which shall be in excess of a premium at the rate of one-half of one per cent. on the amount of insurance, shall be borne and paid by the said party of the second part, its successors or assigns, at its or their own proper charge and expense: provided, further, however, that, if the rate of insurance premium shall exceed one-half of one per cent., then and in that event the party of the second part, its successors or assigns, may themselves effect such insurance upon the aforesaid property in such company or companies as may be satisfactory to the parties of the first part, their heirs, executors, administrators, or assigns, and that in the event of the said party of the second part, its successors or assigns, not paying such excess or premium for insurance, then the parties of the first part, their heirs, executors, administrators, or assigns, may themselves pay such such excess or premium, and the amount so paid by them shall be added to the amount of rent falling due on the quarter day next ensuing."

The premises and building included in this lease comprised a seven-story building, with a frontage of 90 feet on Twenty-Fourth street, running through the entire block to Twenty-Fifth street, with 90 feet frontage on the latter street. It was formerly, before the upper stories were added, known as the "Durant Sugar House," and was occupied as a sugar refinery, in which heavy, vibrating machinery was used, and heavy loads carried. The building throughout its entire length and breadth, was supported internally by a series of wooden posts 12 by 12, set 15 feet apart, in squares, extending throughout the entire building; the posts in each story resting directly over, and in the same vertical line with, similar posts on the floor below. On these posts in each story, rested girders laid upon iron T plates, carrying the floors, and the loads on the floors, directly to the square posts or columns. This system of columns throughout the building served to carry the weights or loads imposed upon each floor. The walls were thus largely relieved of the loads upon the floors of the building, and bore only their own weight and the weight of one-half of the flooring and loading of the building lying between them (the walls) and the first row of posts, about 15 feet distant. It is undoubtedly true that some of the walls were seriously bulged. The testimony of the various witnesses as to their condition is verified by the photographs in evidence, and by the observations of the referee during his inspection, made at the request and in the presence of the counsel of both sides, and establishes that the Twenty-Fourth street wall bulged out between the second

and fourth stories, and then receded or battered in from a true perpendicular line from the fourth story up, although the center of gravity fell within the base of the wall. The long wall on the easterly side, running 200 feet from Twenty-Fourth to Twenty-Fifth streets, weaved, and battered in near the center, to some extent. The westerly wall was also partially bulged. Numerous cracks of various sizes were to be found in some of the walls. It is admitted in the answer that the proceedings instituted by the fire department for the condemnation of the building, after a trial by jury, resulted in a verdict declaiming the unsafety of the walls, and in an order for a precept directing that they be taken down. It does not appear, however, that this precept has ever been executed, nor does it appear why it has not been executed. The building and walls, nevertheless, remain practically as they were at the time of this trial four years ago, and the building has been used continuously by the plaintiff, notwithstanding this verdict was then rendered. Under this lease of May 1, 1888, the plaintiff had the right to take possession of all parts of the demised building. It did occupy all of the premises it required for the business of supplying power and light by electricity; occupying portions of the basement and first floor for the large new engine it put in the building, and so much of the second story as was necessary for the operation of its dynamos. From the evidence I am satisfied that this lease was delivered, and its acceptance has never been in any manner revoked or annulled by either party. The plaintiff, under this lease, has retained title to the property for the term demised as lessee, and has had at all times since, and still has, the right to possession, as against the defendant and all the world, and the exclusive right to enjoy its provisions, and to enforce the performance of all the covenants contained therein on the part of the lessor. The defendant lessor, on the other hand, having executed this lease, and given possession to plaintiff, in consideration of the covenants of the plaintiff to pay the rent reserved, is entitled to receive the rent stipulated under the lease. The claim that plaintiff is in possession under the agreement of lease of November, 1887, and not under the lease executed January 4, 1888, cannot be maintained. The plaintiff actually occupied a portion of the premises after the execution and delivery of the lease, and was clearly vested with the legal right to occupy the whole premises. Plaintiff could not retain this lease, and claim that its occupancy was under some other title. Plaintiff did not refuse to enter into possession because defendant had not completed the alterations covenanted to be made by it, but went into beneficial possession. No rescission of the lease was made, or attempted to be made. Had the plaintiff been sued in ejectment, this lease would have been a defense against the defendant and all others, so far as the evidence in this case discloses title.

It is claimed that the plaintiff was not put in full possession by the defendant, as it is claimed the Knickerbocker Storage Company were on May 1st, and continued after that date, in possession of a portion of the premises on the second and third floors. This evidence is immaterial, even if the fact be disregarded, that, after the making of the lease, certain of the persons largely interested in the plaintiff corporation acquired a large, and, it is claimed, a controlling, interest in the storage company, thereby, defendant argues, taking possession, in effect, of the portion of the premises then occupied by the storage company. Although weight should be attached to this fact, nevertheless there is no pretense that the storage company had any title paramount to that of the plaintiff. Under the facts and circumstances proven, the claim that plaintiff was not put in possession of the premises cannot be maintained, for it is well settled that the lessor is not required to give actual, physical possession of demised premises to the lessee. It is sufficient that he give the lessee the legal right to take possession. Gardner v. Keteltas, 3 Hill, 330. In this case there was no pretense that the plaintiff's title, as lessee, on May 1, 1888, did not give it the legal right to take possession of all the demised premises.

But it is also claimed, strenuously, by the plaintiff, that because of the condition of the walls of the building, and the proceedings which terminated, after the verdict of a jury, in a precept requiring the owner to rebuild them, the plaintiff was and is relieved from its obligation to pay rent. The de-

fendant did covenant to deliver the property demised " in a sound and substantial condition, and in a state of good repair;" and it is urged that "the property demised" was not delivered "in a sound and substantial condition, and in a state of good repair," in that (1) the building itself was unsound; and (2) the boilers and machinery were unsound, and not in good repair. The pleadings admit, substantially, these proceedings of condemnation. Much testimony was given upon the question of the soundness of the walls. The record and judgment order in the condemnation proceedings were not received in evidence, for the reasons stated in the record; but, as both sides urged the materiality of this issue, each side was allowed to make common-law proof of the facts. The evidence taken in this case is, as stated by the counsel, practically the same as was given before the learned judge and jury who tried the fire department proceedings. Were it material to the decision of this case, and had the plaintiff given any evidence upon which judgment for money damages could be predicated because of the alleged unsafety of the walls of the building, there is ample evidence to have sustained a finding that they were not, on the 1st of May, in a "sound and substantial condition, and in a good state of repair," as stipulated in the lease, although plaintiff has treated them as sound. After this decision the plaintiff did not surrender its lease or possession, nor did it claim an eviction. On the contrary, it remained, occupied and used the premises, precisely as it had done before this adjudication. After the adjudication in the fire department proceedings the plaintiff might possibly have elected to treat that determination as an eviction in law, and would, perhaps, have been justified in surrendering the lease, and abandoning the premises, and thus been relieved from further liability to pay rent. While the lease does provide that the landlord shall "pay for all alterations, improvements, rebuildings, and additions of and to the said property which shall be required at any time during the term hereby granted, by any present or future law, ordinance, or authority whatsoever, which shall be made, or procured to be made, by the parties of the first part, at their own proper cost and expense: provided, however, that such alterations, improvements, rebuilding, and additions as are hereinabove covenanted to be made by the parties of the first part shall be such as are of a permanent nature, and become a part of the freehold, and shall not be such as are rendered necessary by reason of the use to which the said property is or shall be put," and also that the said parties of the said first part "should have the right to the possession or control of the said demised premises, or as much thereof as may be requisite, for such time as may be necessary, by reason of such damage, in the same manner and to the same extent as though this lease were not in existence, but without prejudice to any other right or obligation of the parties hereto; and during the time the party of the second part, its successors or assigns, are deprived of the use or possession of the premises hereby demised by reason of such damage and rebuilding by the parties of the first part, the rent hereinbefore reserved, or such part thereof as shall be justly proportionate to the portion or portions of the said demised premises of which the said party of the second part shall be deprived by reason of such damage or rebuilding, or by reason of the possession or control of said premises by the party of the first part, shall be suspended and abated,"—nevertheless, the plaintiff has seen fit neither to abandon the premises nor to rescind this lease. It has remained in continuous possession, and has had the full benefit of the building, as fully as if it had been a new building, of unquestionable safety. It has conducted its business, as far as the evidence shows, as fully and successfully as it could have done in any building of unquestioned safety. It is claimed by the defendant that there is evidence to show that this building, when used as a sugar refinery, safely carried a load much heavier than that now imposed upon it by plaintiff's business, or by the business of any tenant likely to hire any portion of the upper floors; and it is claimed that the building is in precisely the same condition, so far as appearance and the bulging of the walls are concerned, as it was when used as a sugar refinery. The building has not fallen, nor is its present condition, as far as the evidence discloses, any different, practically, from its condition when the plaintiff entered into occupation. The

plaintiff, therefore, not having claimed that it was evicted, and not having surrendered the premises or the lease, cannot be relieved from the obligation to pay the rent reserved in the lease. The question of the safety or unsafety, soundness or unsoundness, of the building, is immaterial in this case. I have therefore expressly refused to make any findings upon this question, and have inserted in the findings a statement that the determination and judgment herein is not based upon, and does not decide, as between the parties, the issue of the soundness or safety of the walls of the building. It is sufficient for the purposes of the decision of this case to find that plaintiff has been in possession and had the beneficial use of the premises up to this date; and there is no reason why the decision of this case should disturb or affect in any way the rights and liabilities of the parties in the future, as fixed or affected by the determination in the fire department proceedings.

The question presented here was, has the plaintiff established any money damages, that can be offset against the rent, on account of the alleged unsoundness of the building? Some testimony was given, tending to show that persons seeking to hire space in the building in the spring of 1888 refused to hire when they heard, or were told, that the building had been declared unsafe. In one case the plaintiff refused to give a lease upon that ground. But the testimony is too indefinite to require or sustain any finding of any specific sum as damages for the alleged breach of covenant to deliver the property demised (as to the walls of the building) to plaintiff on the 1st day of May, 1888, "in a sound and substantial condition, and in a state of good repair."

The plaintiff seeks, also, to offset against its liability upon its covenant to pay rent, damages for alleged breach (1) of the covenant of defendant to make alterations and repairs, to wit, to open and build two new stairways near the Twenty-Fifth street end of the building, altering the hatchways, Otis elevator, etc., covenanted by the defendant to be made and done before the 1st of May, provided a notice should be given to do said work more than thirty days prior to May 1, 1888; and (2) damages for alleged failure to deliver on the said date possession of the boilers and steam engines, as part of the "demised property," in a sound and substantial condition, and in a state of good repair. These claims will be considered separately.

(1) Damages for failure to make alterations, and failure to complete alterations in time: I have found as a matter of fact, upon the evidence, that the plaintiff company gave the defendant, more than thirty days before the 1st of May, a notice to make certain alterations in the stairways, elevators, etc., which was written upon the drawing, Plaintiff's Exhibit G, June 15, 1891. There is no doubt that the material alteration or repair undertaken to be made by the defendant landlord was the taking out of the vacuum pan, and the restoring of the posts and floorings throughout the building in this space, about 60x60, near the Twenty-Fifth street end of the building. This work was not done on the 1st of May. It is therefore claimed by the plaintiff that there was a loss of the rental value of each floor, forming a total area of 23,950 square feet, at approximate rates amounting to $30,366 per year, for the entire period since May, 1888, because, as plaintiff alleges, it "has been prevented from obtaining possession of the greater part of said premises," and that the "building has remained ever since untenantable by reason of the failure of the defendant to make the alterations" above referred to. This claim cannot be allowed. It is undoubtedly true that the plaintiff was prevented, by reason of the failure of the defendant to complete the floors on the 1st of May, from renting portions of the premises to certain tenants. It appears that one Steinfeld offered to hire, and did hire, 30x70 on the southeast corner, fifth story, at $41.66 per month; that he took possession, and left, soon after, because of the lack of convenient access by stairs and elevators to the floor where he had hired space. I have allowed plaintiff the sum of $500, less one month's rent paid, or $458.34, with interest from June 1, 1888, as the loss of the year's rent of this tenant was the natural and necessary result of this breach of defendant's covenant. It appears that the Excelsior Paper-Bag Company would have hired 4,800 square feet at $1,300. As Mr.

Townsend testified, they backed out because they required possession May 1st, and could not get access. The evidence does not satisfy me that there was an actual hiring, which was lost to plaintiff by reason of the failure ·of the defendant to keep the covenant referred to. That parties might have hired is not sufficient to predicate a specific finding of damages. It must appear that the tenant actually hired, and broke his agreement because he could not get possession May 1st, or because the stairways or elevators were not put in. The Bates Laundry Company would have hired 3,000 square feet ·at 15 cents, but plaintiff refused to give it possession, saying the building had been declared unsafe. In the case of Lundgren, who moved out from the shop over the boilers, no proof of rent was made. Nor have I allowed the claim for the rental value of the unoccupied portions of the building on and above the second story at the rates per square foot claimed and proven by the plaintiff for the whole year from May 1, 1888, to May 1, 1889, forasmuch as it is not shown that the plaintiff could have rented those portions of the building had the same been completed on or before the 1st of May. Nevertheless it is true that the plaintiff was entitled to the occupancy of the premises, duly completed, on the 1st of May, and they were not so compl.ted. I have found as a fact, upon the conflicting evidence of the various witnesses, that the floorings were not completed until or towards the middle of May, and the roof was not repaired, and certain outside work was not completed, until the 1st of August; that the building was not substantially completed as required under the notice given by the plaintiff, so far as defendant attempted to alter the same, until August 1, 1888; and I have therefore allowed the plaintiff the amounts set forth in my report as the fair rental values of the various portions of the building not actually occupied by plaintiff during the period the repairs being made by the landlord were delayed, under the rule laid down in Hexter v. Knox, 63 N. Y. 561, and earlier cases. Although the building has never been completed in respect to the putting in of the staircase on the Twenty-Fifth street side, and the change of elevators agreed to be made, I cannot hold that the doing of this work was such an important matter as that it debarred plaintiff from the beneficial use of the various stories after August 1st, or prevented it from letting them. It is true that access to these stories was inconvenient, because they could be reached only through the Twenty-Fourth street narrow stairway; but this did not wholly destroy their rental value, or render them untenantable for the purposes such floors may be commonly used. No evidence has been given to show the difference in the rental value between premises situated as these are, and premises provided with the additional means of ingress and egress stipulated in the lease to be put in by the landlord. The plaintiff could readily have made these repairs and alterations; and had they been made by plaintiff, or had their cost been shown, I should have allowed them as damages. Where the tenant could have made these comparatively slight alterations, and have charged them to the landlord, and has not only failed to make them, but has also failed to show any attempt during the last three years to let the premises as they are, or to prove that their rental value is less, and how much less, than they would have been with the additional stairways and elevators, I cannot allow the full rental value of all the floors not used by plaintiff for its business since 1888, as damages necessarily ·or naturally suffered by it by reason of the failure of the landlord to make the stipulated alterations. Their cost, when the magnitude and the importance of the building and rent reserved are considered, would have been relatively insignificant. This case is unlike those cited where the alterations were indispensable to the beneficial enjoyment of the premises for the purposes for which they were let. If there be anything in the claim that the premises were unrentable because these alterations were not made, it would have been no more than the exercise of good faith on the part of this tenant to have made the repairs itself, and charged them to the landlord. Hexter v. Knox, supra. A different rule should be applied as to the duty of the parties to make such slight alterations, from the rules applicable where the alterations and improvements to be made by the landlord under his lease involve a large outlay, or where it is proved the tenant has not the means to make them. In the latter cases the tenant

should not be expected to make the alterations. Where, however, the expenditure is relatively small, he should make the repairs himself, and charge the cost to the landlord, or at least show diligence in attempting to rent the premises as they are left by the landlord. For these reasons I have allowed the plaintiff, as damages for the said breach of covenant, only the amounts above stated.

(2) Damages for alleged failure of the defendant to deliver on May 1st possession of the boilers and steam engine, as part of the "property demised," in a "sound and substantial condition, and in a state of good repair:" When the lease was made, in January, 1888, the boilers, which, with the engine, were part of the demised premises, must have been known to the plaintiff to have been old and worn, to a certain extent. Their type, age, and general characteristics could have been, and probably were, fully understood by Mr. Moore. It is true that they were partially hidden by scenery stored in the boiler room, but enough was known of them by the plaintiff to apprise its officers of the fact that they were not new and modern boilers and engine. In fact, Moore had a scientific examination and test made by McGovern, a mechanical engineer, whose testimony shows that he made a careful test of several of the boilers, partly in December, 1887, and partly in February, 1888. The old engine, which was of an antiquated type, could have been, and undoubtedly was, seen by the plaintiff's representatives. It cannot be successfully maintained that the plaintiff was entitled to boilers and steam engine of modern, approved, and highly-economical types, such as are undoubtedly required to carry on the business of an electric light company with satisfactory economy and profit. On the other hand, plaintiff was justified in relying upon the covenants in the lease that these particular boilers and engine, such as they were, should be put, on the 1st of May, in "a sound and substantial condition, and in a state of good repair," as a portion of the demised premises. The evidence as to the condition of the boilers and engine is confusing and unsatisfactory. It is claimed by some of the plaintiff's witnesses that the boilers were in such bad condition that it was impossible to put them in a sound and substantial condition, so that they could be used at all, and that the engine was substantially worthless. I cannot assent to this contention. The boilers were undoubtedly old, worn, and of a noneconomical type, and out of repair, when the lease went into effect. The receipt for the boilers in February, then given by plaintiff, is not a conclusive admission that they were in the condition covenanted in the lease. I am convinced that they could have been repaired, so as to have been in the condition covenanted for in the lease, and so as to have been satisfactory to any tenant willing to use such boilers (Griffith & Wondrum) and such an engine as plaintiff hired. It is probably true that such boilers and engine were so poor and wasteful as to be unserviceable to plaintiff in its business, in which, undoubtedly, boilers and engines of the highest economy and refinement are necessary for profitable use. I am satisfied, therefore, that new engines and boilers were put in by the plaintiffs for the purpose of economical administration, and need not have been put in because those hired by them were so bad that they could not have been repaired and used. Neither their cost, nor the interest on their cost, can therefore be allowed as the proper measure of damage for breach of this covenant. The case was reopened after submission to permit plaintiff to make definite the unsatisfactory and incomplete evidence put in before the case was closed. Lahey, plaintiff's witness, testified that plaintiff had spent "close on to $6,000" in repairing the boilers and engine, but when he came to prove details he proved expenditures by vouchers equal to only a little more than $1,800 "on the engine." Justice seems to require that plaintiff should be permitted to prove, if it could, exactly what it did expend in repairing boilers and engine. When the case was opened, positive evidence was given, showing that $6,034.08 was necessarily spent in repairing and patching the boilers and engine. I have deducted from the sum of Exhibits P 1 and 2 of May 28, 1891, aggregating the sum of $10,068.08, the sum, $2,734.08, paid Lahey, chief engineer, and his assistants, Clarey and Wallace, who were regularly employed by plaintiff, and who would have been employed in the care of any boilers and engine that might have been in use. They claim they

worked overtime on repairs, but it appears they received no additional pay for their work on these repairs. I have also deducted $1,300 received by plaintiff for the old boilers as "scrap," leaving the aforesaid balance of $6,034.08, which, I believe, is the fullest indemnity to plaintiff for damage suffered by it by reason of the failure of the defendant to perform its covenant in respect to the boilers and engines.

Defendant's claim for insurance paid by it: The covenant in the lease governing this question has been quoted, to the effect that if there should be imposed, for insuring the property, a premium at a rate greater than that of one-half of one per cent., and if the said increased rate should be imposed by reason of the letting, or of any subletting, the plaintiff should be charged with such excess of premium over the rate of one-half of one per cent. premium. The plaintiff has neglected to effect the insurance, and the landlord has, as was his right under the lease, effected insurance at the rates stated in my report, expending therefor the sums set forth in my report, which it claims to recover, in addition to rent, under the said terms of the lease. The plaintiff maintains, on the other hand, that this rate was excessive, and that such insurance should have been effected by the landlord at a rate not to exceed three-fourths of one per cent., or one per cent. I have concluded to allow the defendant landlord the amounts so paid by it as premiums, for the following reasons: The tenant, if its contention be true, might have effected and paid the insurance on its own account. It saw fit not to do so. Under these circumstances, any claim that the landlord, in paying the rate it did, acted in bad faith or negligently, should, before it is allowed, be sustained by the clearest evidence. I am satisfied that the landlord exercised good faith and ordinary prudence in effecting such insurance. The testimony of the various experts called to establish the fact that the rates paid by the landlord were excessive was most unsatisfactory. It clearly appears that there is no fixed market rate of insurance upon risks of this character, and that competition is such that agents with special facilities may place insurance at very much lower rates than other agents of equally good standing, and of as large experience. The rate of insurance may have been increased by reason of the fact that the building had been condemned as unsafe. If satisfactory evidence had been submitted to show that insurance premiums were increased any certain and definite amount by reason of this fact, I should have allowed such claim, but the plaintiff failed to offer any evidence of this character. The mere general statement by insurance agents that the rates of insurance were increased because of such condemnation affords no basis for computing any just allowance to be made plaintiff on this account. I have therefore allowed the claim of the defendant, as above stated.

Taxes: By the provisions of the lease above referred to, the plaintiff tenant was required to bear, pay, and discharge all taxes and assessments and charges, ordinary and extraordinary, during the term created by the lease. It has not done so, and the defendant has shown that the sums found in my report have been paid by it up to date on account of said premises, which I have allowed. Water rates, amounting at this date to $——, have also become liens on the property. As to one item, plaintiff has presented to the commissioner of public works of the city of New York a claim that it is, in effect, a duplicate charge, and has asked for a reduction, which has not as yet been granted. A provision will be made in the findings, protecting plaintiff from the effect of this prima facie adjudication of its liability to pay this disputed item in full, should it be hereafter reduced.

The decision of the questions in this case has not been free from embarrassment, especially as to the claim of the plaintiff that it should be credited with the full rental value of the unoccupied portion of the premises from the date of the lease to the present time. I have given this claim deliberate consideration, and cannot assent to it, in any view. The only evidence of attempted renting was in or about 1888. Where the plaintiff has failed to show any attempts to rent any portion of the vacant floors since this time, I cannot understand how it expects to maintain such a claim. It is no answer to say that the building may have been unsafe. It seems the plaintiff and its of-

ficers have treated it as safe and tenantable, by maintaining possession and dominion over it in every part. Plaintiff cannot therefore be heard to say that it should not be used by them or subtenants, and that they should not attempt to rent it. For all that appears from the evidence, the upper floors, or parts of them, might have been rented, either May 1, 1889, 1890, or 1891. On the other hand, they might not have been rented. I cannot render a judgment based upon what I may guess would have been the fact. To allow plaintiff a profit, as is asked, of $15,000 per year over its rental, as damages for remaining idle during these four years while it legally occupied the building to the exclusion of defendant, in the absence of any evidence of attempts to rent, other than those proved to have been made in the spring of 1888, would be wholly unwarrantable, as must appear from the very statement of the proposition.

Argued before BOOKSTAVER, BISCHOFF, and PRYOR, JJ.

William H. Kelly, Henry B. Twombly, and William B. Putney, for appellant.

Charles J. Hardy and Esek Cowen, for respondent.

PER CURIAM. In so far as the decision of the case turned upon questions of fact, a careful study of the evidence convinces us that we should not be authorized to reverse the judgment because inconsistent with the preponderant proof. Baird v. Mayor, etc., 96 N. Y. 567. As to the propositions of law upon which the judgment proceeds, an examination of the authorities assures us that they are well supported, and were correctly applied by the referee. In view of the adjournment of the court until November, the preparation of an argument to sustain our conclusions would involve a delay in the determination of the appeal, of which the parties might well complain; and, after all, we are by no means sure that anything of moment can be added to the very thorough and satisfactory consideration of the points in controversy by the learned referee. Upon the opinion of the referee the judgment is affirmed, with costs.